Sara Jane **WEIBLE,** Executrix of The Estate of William Weible, and in her own right, Appellant

v.

**ALLIED SIGNAL, INC., Amchem Products, Inc., American Standard, A.O. Smith Corp., Asbestos Corp., Ltd., Asten Group, Inc., A.W. Chesterton Inc., Bell Asbestos Mines, Inc., Benjamin Foster, Co., Bondex International, Inc., Brand Insulations, Inc., Broudy**

Supply Co., Certainteed Corp., Inc., Crane Packing, Crown Cork & Seal Co., Inc., Dresser Industries, Inc., Foster Wheeler Corp., Inc., Garlock, Inc., General Electric Co., Georgia–Pacific Corp., Goulds Pumps, Inc., Green Tweed & Co., Inc., Hajoca Plumbing Co., J.H. France Refractories Co., Melrath Gasket Holding Co., Inc., Metropolitan Life Insurance Co., Nosroc Corp., Owens–Illinois, Inc., Pars Manufacturing Co., Pecora Corp., Rapid American Corp., Riley Stoker Corp., Bevco Industries, Rockbestos Co., Sid Harvey Mid Atlantic, Inc., Union Carbide Corp., Weil McLain Co., Weinstein Supply Co., Westinghouse Electric Corp., Bell & Gossett Pump Co., Bns Co., Burnhan Holdings, Carrier Corp., Crane Co., Crouse–Hinds, Durabla, Hercules Chemical Co., KimberlyClark Corp., Walter B. Gallagher Co., Atco, Borg–Warner Corp., Columbia Boiler Co., Chrysler Corp., Ford Motor Co., General Motors Corp., Ingersoll Rand, John Crane, Inc., Maremont Corp., Pa Brake Bonding, Pneumo Abex Corp., United Gilsonite Laboratories, Industrial Petrolic Corp., BBC Brown Boveri, Brake & Clutch Co. of Philadelphia, Carlisle Corp., Davis Brake & Equipment Corp., McArdle Desco Corp., McCord Gasket Co., Rheem Manufacturing Co., Rockwell International, Ruud Corp., Sms Automotive Products, Sos Products Co., Vellumoid Inc., Deacon Industrial Supply Company, Cutler–Hammer Co., Westinghouse Air Brake Co., Goodyear Tire & Rubber Co., Goodyear Canada, Inc., Chester Auto Parts, Appellees.

Superior Court of Pennsylvania.

Argued Sept. 17, 2008.
Filed Dec. 19, 2008.

Steven J. Copperstein, Philadelphia, for appellant.

Mark D. Eisler, Philadelphia, for McCord, for appellee.

Anne K. Seelaus, Media, for Borg–Warner, appellee.

Catherine N. Jasons, Philadelphia, for Carlisle, appellee.

BEFORE: BENDER, DONOHUE, and FREEDBERG, JJ.

OPINION BY FREEDBERG, J.:

¶ 1 In this asbestos personal injury action, Appellant Sara Jane Weible, individually and as executrix of the estate of her late husband William Weible, appeals from orders granting summary judgment in favor of Borg–Warner Corporation ("Borg–Warner"), Brake & Clutch Company of Philadelphia ("B & C"), Carlisle Companies Incorporated ("Carlisle"), and McCord Corporation ("McCord"). William Weible was employed as a residential boiler installer for Philadelphia Electric Company, now known as PECO, and spent time in the presence of automobile mechanics at the PECO garage facility in Morton, Pennsylvania. The mechanics performed automobile maintenance and repairs, including daily brake and clutch work, and less frequent gasket work, with asbestos-containing brakes, clutches, and gaskets. We conclude that there is sufficient record evidence against Borg–Warner, B & C, and Carlisle to withstand summary judgment. Accordingly, we reverse and remand as to Borg–Warner, B & C, and Carlisle. We conclude that the trial court correctly entered summary judgment in favor of McCord and we affirm the grant of summary judgment as to McCord.

¶ 2 In June of 2005, William Weible was diagnosed with mesothelioma, a cancer of the mesothelial tissue surrounding the lung caused by exposure to asbestos. He and his wife, Sara Jane Weible, filed suit against a number of parties, including Borg–Warner, B & C, Carlisle, and McCord, alleging that Mr. Weible's exposure to asbestos caused his mesothelioma. During the pendency of the action, Mr. Weible died from the disease. Borg–Warner, B & C, Carlisle, and McCord ultimately moved for summary judgment contending that Appellant failed to adduce sufficient evidence to establish that Mr. Weible inhaled asbestos fibers shed from their respective products. The trial court granted summary judgment for each of the four companies by orders dated July 9, 2007, and docketed July 10, 2007. Appellant filed notice of appeal on July 19, 2007, and Appellant thereafter filed a statement of errors in compliance with Pennsylvania Rule of Appellate Procedure 1925. In turn, the trial court issued an opinion pursuant to Rule 1925.

¶ 3 The posture of this appeal requires that we address the threshold

issue of our jurisdiction to entertain the appeal. Appeal may be taken only from a final order, that is, an order that disposes of all claims and all parties. Pa.R.A.P. 341(a). A number of defendants remained of record following the trial court's grant of summary judgment for Borg–Warner, B & C, Carlisle, and McCord. This fact appears to call into question the finality of the trial court's orders granting summary judgment. However, the record reflects a July 16, 2007 trial court docket entry noting that this case was settled as to all remaining non-bankrupt parties, except the Manville Fund, but the case against the Manville fund was dismissed. "A trial court order declaring a case settled as to all remaining parties renders prior grants of summary judgment final for Rule 341 purposes, even if the prior orders entered disposed of fewer that all claims against all parties." *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 650 (Pa.Super.2002); *Harahan v. AC & S, Inc.*, 816 A.2d 296, 297 (Pa.Super.2003). In this case all parties are now settled, bankrupt, or dismissed by grant of summary judgment or otherwise. Consequently, the grants of summary judgment for Borg–Warner, B & C, Carlisle, and McCord are final orders for appeal purposes and the present appeal is properly within our jurisdiction. *Gutteridge*, 804 A.2d at 650; *Harahan*, 816 A.2d at 297.

¶ 4 Appellant raises a single issue for our consideration, namely, whether the trial court abused its discretion or committed an error of law in concluding that there was insufficient record evidence to establish that Mr. Weible was exposed to Borg–Warner, B&C, Carlisle, and McCord asbestos-containing products. The issue calls upon us to review whether the record evidence of exposure to asbestos-containing material was sufficient to meet the frequency, regularity, and proximity test

of *Eckenrod v. GAF Corp.*, 375 Pa.Super. 187, 544 A.2d 50 (1988).

¶ 5 We review a grant of summary judgment under the following well-settled standards:

Pennsylvania law provides that summary judgment may be granted only in those cases in which the record clearly shows that no genuine issues of material fact exist and that the moving party is entitled to judgment as a matter of law. The moving party has the burden of proving that no genuine issues of material fact exist. In determining whether to grant summary judgment, the trial court must view the record in the light most favorable to the non-moving party and must resolve all doubts as to the existence of a genuine issue of material fact against the moving party. Thus, summary judgment is proper only when the uncontraverted allegations in the pleadings, depositions, answers to interrogatories, admissions of record, and submitted affidavits demonstrate that no genuine issue of material fact exists, and that the moving party is entitled to judgment as a matter of law. In sum, only when the facts are so clear that reasonable minds cannot differ, may a trial court properly enter summary judgment.

[O]n appeal from a grant of summary judgment, we must examine the record in a light most favorable to the non-moving party. With regard to questions of law, an appellate court's scope of review is plenary. The Superior Court will reverse a grant of summary judgment only if the trial court has committed an error of law or abused its discretion. Judicial discretion requires action in conformity with law based on the facts and circumstances before the trial court after hearing and consideration.

*Gutteridge,* 804 A.2d at 651. (citations omitted)

■■■ ¶ 6 To withstand a summary judgment motion in an asbestos case, a plaintiff must meet the following standard:

In order for liability to attach in a products liability action, plaintiff must establish that the injuries were caused by a product of the particular manufacturer or supplier. Additionally, in order for a plaintiff to defeat a motion for summary judgment, a plaintiff must present evidence to show that he inhaled asbestos fibers shed by the specific manufacturer's product. Therefore, a plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use. Summary judgment is proper when the plaintiff has failed to establish that the defendants' products were the cause of plaintiff's injury.

Whether direct or circumstantial evidence is relied upon, our inquiry, under a motion for summary judgment, must be whether plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant. Whether a plaintiff could successfully get to the jury or defeat a motion for summary judgment by showing circumstantial evidence depends upon the frequency of the use of the product and the regularity of plaintiff's employment in proximity thereto.

*Eckenrod,* 544 A.2d at 52, 53. (citations omitted)

¶ 7 In applying the *Eckenrod* frequency, regularity, and proximity test, we should be mindful of the limits of *Eckenrod.* In *Eckenrod,* three coworkers supplied affidavits indicating that they worked with the deceased plaintiff and that the deceased plaintiff was exposed to asbestos products, but the affidavits "did not elaborate on the nature or length of the exposure or the brand of the products available." *Eckenrod,* 544 A.2d at 52. Moreover, "while the affidavits admitted that Mr. Eckenrod was 'exposed to' asbestos products, none clarified the proximity of the products to the workers or that the appellees were the manufacturers/suppliers of the products being used." *Eckenrod,* 544 A.2d at 52–53. Importantly, in *Eckenrod,* "the only testimony as to the identification of any of the products came from the depositions of distributors of the asbestos products and one main plant storeroom employee at B & W. Each of these depositions indicates that various appellees sold asbestos products to B & W, but do not establish where the specific product was used or that Mr. Eckenrod came into contact with an identifiable product." *Eckenrod,* 544 A.2d at 53. Confronted with evidence of little more than proof that the offending product was shipped into the plant, this Court found that there was "not even a reasonable inference that appellant was exposed to appellees' asbestos products." *Eckenrod,* 544 A.2d at 53.

■■ ¶ 8 There is no requirement that a plaintiff who suffers an asbestos related injury must establish the specific role played by each individual asbestos fiber within the body. *Gutteridge,* 804 A.2d at 652; *Lonasco v. A–Best Products Co.,* 757 A.2d 367, 375 (Pa.Super.2000). "Instead, in order to make out a *prima facie* case, it is well established that the plaintiff must present evidence that he inhaled asbestos fibers shed by the specific manufacturer's product." *Lonasco,* 757 A.2d at 375–76 (italics added). A plaintiff must, however, establish more than the mere presence of asbestos in the workplace. The plaintiff must establish that he worked in the vicinity of a specific manufacturer's product.

*Gutteridge,* 804 A.2d at 652; *Lonasco,* 757 A.2d at 376.

¶ 9 The nexus between an asbestos product and plaintiff may be established by direct and circumstantial evidence. *Gutteridge,* 804 A.2d at 652; *Lilley v. Johns–Manville Corp.,* 408 Pa.Super. 83, 596 A.2d 203, 207 (1991). The testimony of a witness with knowledge relating to the plaintiff's workplace exposure to an asbestos-containing product is admissible when probative. *Gutteridge,* 804 A.2d at 652–653; *Lilley,* 596 A.2d at 207. Even when the plaintiff is not able to identify specific products manufactured by particular defendants, the testimony of co-workers is admissible to establish that the plaintiff worked in close proximity to the asbestos products in question. *Gutteridge,* 804 A.2d at 653; *Taylor v. Celotex Corp.,* 393 Pa.Super. 566, 574 A.2d 1084, 1091–92 (1990).

¶ 10 The frequency, regularity, and proximity test of *Eckenrod,* was adopted by the Pennsylvania Supreme Court in *Gregg v. V–J Auto Parts Company,* 596 Pa. 274, 943 A.2d 216 (2007). In *Gregg,* the Supreme Court stated:

> In this regard, the decision in *Tragarz v. Keene Corp.,* 980 F.2d 411 (7th Cir. 1992), referenced by both parties, provides helpful guidance concerning the application of the frequency, regularity, proximity factors in asbestos litigation. *Tragarz* explains that these criteria do not establish a rigid standard with an absolute threshold necessary to support liability. Rather, they are to be applied in an evaluative fashion as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm, from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product.

> Further, *Tragarz* suggests that the application of the test should be tailored to the facts and circumstances of the case, such that, for example, its application should become "somewhat less critical" where the plaintiff puts forth specific evidence of exposure to a defendant's product. Similarly, under *Tragarz,* the frequency and regularity prongs become "somewhat less cumbersome" in cases involving diseases that the plaintiff's competent medical evidence indicates can develop after only minor exposures to asbestos fibers.

> We agree with the *Tragarz* court's approach and adopt it here.

*Gregg,* 943 A.2d at 225–226 (internal citations omitted).

¶ 11 The Supreme Court concluded with the following observation in *Gregg:*

> In summary, we believe that it is appropriate for courts, at the summary judgment stage, to make a reasoned assessment concerning whether, in light of the evidence concerning frequency, regularity, and proximity of a plaintiff's/decedent's asserted exposure, a jury would be entitled to make the necessary inference of a sufficient causal connection between the defendant's product and the asserted injury.

*Gregg,* 943 A.2d at 227.

¶ 12 In a recent *en banc* decision, this Court applied *Gregg* and *Eckenrod* to uphold a grant of summary judgment in an asbestos exposure case involving a lung cancer death. *Tarzia v. American Standard,* 952 A.2d 1170 (Pa.Super.2008) (*en banc*). In *Tarzia* there was "nothing in the record to show what company manufactured any of the brake shoes Tarzia came into contact with," and there was "nothing in the record to show whether any of the brake shoes Tarzia came into contact with even contained asbestos."

*Tarzia,* 952 A.2d at 1174. Under those particular circumstances, this Court concluded that a plaintiff "cannot demonstrate with any degree of confidence or certainty the frequency, regularity or proximity that Tarzia was exposed to any product from Cobra/American Standard." *Tarzia,* 952 A.2d at 1174.

¶ 13 The record before us discloses the following. Mr. Weible worked as a residential boiler installer for PECO from 1958 to 1991. In doing his work, Mr. Weible drove a PECO fleet vehicle out of the PECO facility in Morton, Pennsylvania. The PECO fleet at the Morton facility consisted of as many as 350 vehicles, including cars, vans, and trucks. Routine maintenance and repairs of the fleet vehicles were performed by mechanics in a garage at the Morton facility. The garage had sufficient space for up to five or six vehicles at a time.

¶ 14 Over his time working for PECO, Mr. Weible developed a daily practice of parking his fleet vehicle, walking through the garage to clock out for the day, and remaining in the garage with the mechanics on duty. There were days when Mr. Weible spent as little as a few minutes in the garage; other days when he spent approximately one-half hour; and still other days when he spent as much as three to four hours. The mechanics would perform maintenance and repairs in the presence of Mr. Weible, including work involving asbestos-containing brakes, clutches, and gaskets. The process of removing and replacing brakes, clutches, and gaskets produced asbestos dust. Two mechanics from the Morton facility, Paul Baylor and David DeMarco, recalled their ongoing contact with Mr. Weible, and also recalled their use of Borg–Warner clutches, B & C brakes and clutches, Carlisle brakes, and McCord gaskets. Baylor was at the Morton facility from the mid–1960's to the

mid–1980's; DeMarco was there from the mid–1970's to the mid–1980's.

¶ 15 In entering summary judgment, the trial court concluded that Appellant failed to establish, either through direct or circumstantial evidence, that Mr. Weible inhaled asbestos fibers from Borg–Warner, B & C, Carlisle, and McCord products. The trial court identified general deficiencies in the evidence as to all four of the brake, clutch, and gasket manufacturers, including: (1) that the evidence was unclear as to the number of years over which Mr. Weible engaged in the practice of remaining in the garage with mechanics; (2) that the evidence was unclear as to the length of time Mr. Weible spent with mechanics on any of the particular days over the years; and (3) that the evidence was at best equivocal as to whether the mechanics actually performed work while Mr. Weible was present. Generally, the trial court found:

> In short, Decedent's testimony lacked certainty and specificity. Stopping by a garage for a few minutes a day for an indeterminate period does not rise to the level of regular, frequent, or proximate exposure require under *Eckenrod.* Moreover, interpreting the testimony would require speculation as to the regularity of Decedent's visits. It is clear under *Juliano* that the Court cannot speculate in order to allow Plaintiff to survive summary judgment.
>
> Furthermore, Decedent never testified that any of the moving Defendants' products were used when he visited the garage. Also, Decedent never testified that Defendants' products contained asbestos. As will be later discussed, Plaintiff attempted to elicit further product identification testimony from Baylor and DeMarco. However, this Court did not consider such testimony because it

was improperly elicited through leading questioning.

Plaintiff alleges Decedent had regular, frequent and proximate contact with asbestos over ambiguous periods of time during which asbestos exposure was not established. Also, Plaintiff failed to present sufficient product identification evidence linking Decedent to asbestos products made by Defendants. Thus, regular, proximate, and frequent exposure to asbestos fibers was not established.

Trial Court 1925 Opinion, 3/18/08, at 6. Beyond general deficiencies, the trial court also identified certain deficiencies in the evidence specific to each of the four asbestos manufacturers.

¶ 16 With regard to Borg–Warner clutches, the trial court found that all of the product identification testimony linking Mr. Weible to exposure to Borg–Warner clutches was elicited by improper leading questions of the two mechanics. Pertinent product identification testimony regarding Borg–Warner consisted of the following:

Q: Looking at that first page of what we've marked as Baylor–1, do you remember working with Borg Warner clutches?

[Objection]

A: Yes.

Q: And did you check that off, is that an "X" there?

A: Yes, it is.

Q: What do you remember about Borg Warner?

A: They were asbestos clutches.

Q: Did the Borg Warner asbestos clutches produce dust when you worked on them?

[Objection]

A: Yes.

Q: Did you breathe the dust?

[Objection]

A: Couldn't help it, yes.

Q: Was Mr. Weible around when you were working on Borg Warner clutches?

[Objection]

A: That I can't, I can't attest to.

[Withdraw the objection]

Deposition of Paul Baylor, 2/6/07, at 47–49.

Q: You talked about Borg–Warner clutches, do you recall that?

A: Yes.

Q: Well, what's the difference between a clutch and a brake?

A: Well, one starts the vehicle, the other stops it.

Q: Did the clutches have asbestos products in them?

A: Yes.

Q: Why was asbestos needed in a clutch as opposed to a brake?

A: Well, basically to resist the high heat.

Q: Was clutch work, or either replacing old clutches a regular part of your work as a PECO mechanic?

A: Yes.

Q: When you removed and installed Borg–Warner clutches was dust created?

[Objection]

A: Yes.

Q: Could you see the dust in the air?

A: Very much so.

Q: Without, again, worrying about a specific date, do you have a clear recollection, as you sit here, of Bill Weible being present when Borg–Warner clutches were removed or installed?

[Objection] A: Yes.

Q: Was dust created during that process and did Bill Weible breathe that dust?

A: Yes.

[Objection]

Deposition of Paul Baylor, 2/21/07, at 185–187.

Q: Now, the next item on D–1 is under the heading Clutches. And I have a tough time reading your handwriting. What's the next word?

A: I'm sorry.

Q: That's okay.

A: Borg–Warner.

Q: How do you remember Borg–Warner?

A: I just recall the product. It had a nice—it was packaged nice.

Q: What do you mean, packaged nice?

A: It came in a nice box, different.

Q: Did you actually see the name Borg–Warner on the box?

A: Yes.

Q: Was the clutch, or were the clutches that Borg–Warner sold asbestos containing?

A: Yes.

Q: Did you work with them on a regular and frequent basis while a mechanic at PECO?

[Objection]

A: Yes.

Q: When you used the Borg–Warner asbestos containing clutch was dust created?

A: Yes.

[Objection]

Q: In the same manner that you've previously described with clutches?

[Objection]

A: Yes.

Q: Do you have a recollection of Mr. Weible being present in the garage, on multiple occasions, when you either removed or installed a Borg–Warner asbestos containing clutch?

[Objection]

A: Yes.

Q: Was he exposed to the same asbestos dust created by that Borg–Warner clutch that you were?

[Objection]

A: Yes.

Q: Do you have any question about that?

[Objection]

A: No.

Deposition of David DeMarco, 2/21/07, at 58–60.

¶ 17 As to B & C brakes and clutches, the trial court found that the only product identification testimony linking Mr. Weible to exposure to B & C brakes and clutches was elicited through improper leading questions. Although mechanic Paul Baylor associated B & C products with a different facility, pertinent product identification testimony of mechanic David DeMarco as to B & C products consisted of the following:

Q: The next name on the list is what, would you read that, please?

A: That's Brake & Clutch Company of Philadelphia.

Q: And what did they manufacture?

A: They manufactured brakes and clutches.

Q: And did those brakes and clutches contain asbestos?

A: Yes.

Deposition of David DeMarco, 2/21/07, at 42–43.

Q: Now, I want to ask you a general question, and this pertains to both the asbestos containing brakes and the asbestos containing clutches that were sold by Brake and Clutch Company of Philadelphia. Without worrying about a specific date, do you have a clear recollection that Mr. Weible would have been in the garage, on multiple occasions, when

you were working with Brake & Clutch Company of Philadelphia asbestos products?

[Objection]

A: Yes.

Q: Would he have been exposed to the same asbestos dust, that you were, from those products?

A: Yes.

Q: And did he breathe that dust?

A: Yes.

[Objection]

Deposition of David DeMarco, 2/21/07, at 48.

Q: I totally understand that. But what I'm trying to get at is, Mr. Weible, as you sit here today, do you have a recollection, and I'm not asking for a date and time, but a recollection of Mr. Weible coming through the shop when you're using a Brake & Clutch product?

A: I have a recollection of Mr. Weible being there all the time.

Q: Okay.

A: And if we used Brake & Clutch parts, which I'm stating to you that we did, in the shop, then I'm going to say, yes, I have a recollection of Bill Weible being in the there. Because he was there all the time.

Deposition of David DeMarco, 2/21/07, at 82.

¶ 18 With regard to Carlisle brakes, the trial court found that Mr. Weible was only connected to Carlisle brakes through improper leading questions and speculative testimony. Pertinent product identification testimony relating to Carlisle consisted of the following:

Q: The next name on your list, DeMarco-1, what is that, please?

A: That's Carlisle.

Q: And what did Carlisle make or sell?

A: Brakes.

Q: And did they make brakes for different vehicles in terms of different sizes?

A: Yes.

Q: Would they come packaged the same way you described the other brakes?

A: Yes.

Q: Would you install the Carlisle brakes in the same way you did the Bendix brakes and the brakes from Brake & Clutch Company of Philadelphia?

A: Yes.

Q: Anything different, at all, about using Carlisle brakes as opposed to the other brakes?

A: No, it's just a different product, that's all.

Q: Were the Carlisle brakes asbestos brakes? [Objection]

A: Yes.

Q: Did you have to sand those brakes when you installed them?

[Objection]

A: Yes.

Q: Did the Carlisle brakes create dust when you worked on them?

[Objection]

A: Yes.

Q: Could you see the dust in the air?

A: Yes.

Q: Do you have a recollection of Mr. Weible being present in the garage, on multiple occasions, when you were handling the Carlisle brakes, that he was present at the same time?

[Objection] A: Yes.

Q: Did he breathe asbestos dust from the Carlisle brake product as you were working on it?

[Objection]

A: Yes.

Deposition of David DeMarco, 2/21/07, at 49–51.

> Q: Now, as you sit here today, Mr. DeMarco, do you have a specific recollection of Mr. Weible ever being around when you were actually installing a Carlisle brake?
>
> A: Yes. Bill was there all the time. So if we got a set of Carlisle brakes in, he would have been there talking with us.
>
> Q: I understand that you believe that he was around in the shop frequently and that on many of those occasions you may have been doing brake work. My question is, as you sit here today do you have an actual, specific recollection of Mr. Weible being present when you were installing a brake that you associated with Carlisle?
>
> A: I got to say that, yes, I do recall. I mean, I recall putting brakes on. I recall Bill being there. As far as like, you know, your particular brake, I'm going to say yes because he was there all the time. I know I'm redundant in my answer, but I'm not sure—I mean, on January 5th, this particular day, I couldn't—
>
> Q:—I'm not asking about a specific day. But is there a specific vehicle or is there a specific time when you remember Mr. Weible being there and you were actually installing a Carlisle brake? Or, is what you're telling me, simply that you installed Carlisle brakes and Bill was around, so therefore he had to have been around?
>
> A: Yes, that's what I'm telling you.
>
> Q: That's your assumption, correct?
>
> A: Yes.

Deposition of David DeMarco, 2/21/07, at 119–120.

¶ 19 Moreover, the trial court considered Carlisle evidence that Carlisle never sold brakes to PECO and further Carlisle evidence suggesting that Carlisle never made the type of brakes described by the mechanics.

¶ 20 Our review of the record evidence against Borg–Warner, B & C, and Carlisle leads us to conclude that the trial court took an overly restrictive view of the evidence and the applicable legal standards at the summary judgment stage. The testimony quoted at length above, when viewed in the light most favorable to Appellant, and resolving all doubts against Borg–Warner, B & C, and Carlisle, establishes that the brake and clutch products were frequently used in the Morton garage, that Mr. Weible was regularly in proximity to the brake and clutch products, and that Mr. Weible's contact with the brake and clutch products was of a nature to give rise to a reasonable inference that Mr. Weible inhaled asbestos fibers from the products. *See Coward v. Owens–Corning,* 729 A.2d 614, 622–623 (Pa.Super.1999) (evidence must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference that he inhaled asbestos fibers shed from the product) *citing Eckenrod,* 544 A.2d at 52; *Samarin v. GAF Corp.,* 391 Pa.Super. 340, 571 A.2d 398, 405 (1989).

¶ 21 The trial court relied heavily on language concerning leading questions contained in this Court's decision in *Wilson v. A.P. Green Industries, Inc.,* 807 A.2d 922 (Pa.Super.2002). In *Wilson,* the lone product identification witness testified at deposition that she was unable to say whether or not she saw the plaintiff use the cement product at issue. The witness stated, "I did not really know what they were using...." Plaintiff's counsel then asked the following questions:

> Q: Do you believe—is what you're saying here to me then is that at one time

or another during the year people would use this Flintkote Fibrex Cement around you and Dolly Chase?

[Objection.]

A: That's what I'm saying. That's what I'm saying.

Q: And do you think that this product, this fibrex cement that they were using, made dust?

[Objection]

A: All of the products that I have stated, all of them, made dust.

*Wilson,* 807 A.2d at 926, n. 1.

¶ 22 In *Wilson,* this Court described this quoted exchange and the evidence in that case as follows:

Despite Ms. Usher's obvious inability to remember the use of these products around her or decedent, appellant's counsel mischaracterized her answer and asked two leading questions. The answers she provided were completely opposite the statements she made without prompting just moments earlier. Answers to such inappropriate leading questions are not admissible and may not serve as the basis for surviving a summary judgment motion. The trial court did not err, therefore, in refusing to consider this portion of Ms. Usher's deposition.

Since appellant offered no direct evidence that decedent inhaled any asbestos-containing Flintkote product, the court correctly ruled that she needed to satisfy the *Eckenrod* standard, i.e., that decedent worked in proximity to such a product on a regular basis. Ms. Usher's testimony clearly failed to establish this type of exposure, and summary judgment was proper.

Even if Ms. Usher's answers to counsel's leading questions were admissible, we would rule that her testimony, when taken as a whole, fails to demonstrate that decedent inhaled fibers from Flintkote Fibrex Cement. Ms. Usher stated that, at most, decedent was exposed to dust from appellee's product "at one time or another." This testimony is far too vague and unsubstantiated to prove even one instance of exposure to the product, let alone to establish that decedent regularly worked in proximity to it. The inadequacy of this testimony becomes even clearer when we consider Ms. Usher's previous response that she could not remember anyone using the Flintkote product around decedent. When a plaintiff's lone witness contradicts herself in this fashion, such testimony cannot establish a genuine issue of material fact.

*Wilson,* 807 A.2d at 926–927 (citations omitted).

¶ 23 It is our view that *Wilson* stands for the very obvious proposition that where the lone product identification witness is unable to identify the offending product, summary judgment is proper, and counsel cannot save the case by forming a question that mischaracterizes the witness' testimony and simply secures the obliging acquiescence of the witness. This reading of *Wilson* is supported by our decision in *Harahan,* 816 A.2d at 298. In reversing grant of summary judgment in favor of an asbestos defendant, we quoted product identification testimony elicited as follows:

Q: Did you and [the decedent] breathe dust from the Lagtone product?

[Objection]

A: Yes, we did.

*Harahan,* 816 A.2d at 298. In evaluating this product identification testimony, we stated:

We note that, while there was an objection to the first question, the purpose was not preserved. In addition, no trial ruling was made on the objection.

There is no reason, then, not to consider the answer.

*Harahan,* 816 A.2d at 298 (citation omitted).

¶ 24 In reviewing the product identification testimony relating to Borg–Warner, B & C, and Carlisle, with specific reference to those portions of the testimony identified by the trial court as elicited in response to leading questions, we make several observations. First, it is not clear that all of the questions met with objection were, in fact, leading questions. Second, the product identification testimony here does not suffer from the same inadequacies as did the product identification testimony in *Wilson.* The product identification witnesses in this case demonstrated an ability to call up specific recollection of the brake and clutch products at issue, unlike the lone product identification witness in *Wilson* who candidly testified to a complete lack of knowledge when she stated "I did not really know what they were using. . . .". Third, the subsequent decision of this Court in *Harahan* makes clear that under the circumstances there is no blanket prohibition on considering product identification testimony like that presented in this case.

■ ¶ 25 The general contention in support of summary judgment is that, at best, the evidence establishes only that Mr. Weible was present while the mechanics worked, but that a jury would be required to speculate to conclude that the mechanics ever regularly worked with any of the identified asbestos products in the presence of Mr. Weible. On this record, and mindful of the standards governing summary judgment, we find this general contention without merit. The asbestos defendants may have cogent argument as to why they should not be found liable by a jury. This, however, misses the point at the summary judgment stage. Pinpoint precision in the proofs may be desired, but it is not required. The record evidence before us concerning the frequency, regularity, and proximity of Mr. Weible's asserted exposure to the brake and clutch products entitles a jury to make the necessary inference of a sufficient causal connection between the brake and clutch products and Mr. Weible's mesothelioma.

■ ¶ 26 The same cannot be said for Mr. Weible's asserted exposure to the McCord gasket product. As to McCord gaskets, the trial court found the product identification evidence entirely speculative. Pertinent product identification testimony relating to McCord consisted of the following:

Q: Now, based on your testimony from the first day and your answers to my questions earlier, stating that you could not identify the manufacturer of any of the gaskets that you were removing. Would I be correct that, as you sit here today, under oath, you don't recall Mr. Weible ever being around when you were removing a McCord product?

A: The chance is of him being there was as good as—very good, because he was there so often that he would have been subjected to anything I was subjected to. So, if I was removing the gasket, and he was there, he would be subjected to the same air I was breathing.

[Objection, move to strike, it's speculative.]

Deposition of Paul Baylor, 2/21/07, at 155.

Q: Do you have a specific recollection of Mr. Weible ever being present when you were using a McCord product?

A: Not a specific, but if I was working with it and he came in, he was breathing the same air I was.

[Objection, move to strike as speculation.]

Q: And I understand you know what you worked with and you know that Mr. Weible was in the garage on occasion. But my question to you is, do you know, whether on any of those occasions, you were actually using a McCord product when he was there?

A: Not specifically.

Deposition of Paul Baylor, 2/21/07, at 157–158.

Q: Okay, we'll take it a little bit further then. Forget the wall for one minute. But when you were removing the products and you said you couldn't identify the manufacturer of the gaskets you were removing—

A:—I don't recall ever seeing Victor stamped on a gasket or McCord stamped on a gasket. I don't recall that.

Q: Okay, so you would have no way of knowing whether Mr. Weible was around when you were removing a gasket manufactured by Victor or McCord specifically, correct?

A: That's correct.

Deposition of David DeMarco, 2/21/07, at 108.

¶ 27 Appellant points us to no product identification of the kind developed in relation to Borg–Warner, B & C, and Carlisle. The record evidence as to McCord in most all respects simply establishes that the McCord gasket product was present in the Morton facility and that the McCord gasket product was used at the Morton facility. This is not sufficient under the applicable legal standards.

¶ 28 Order granting summary judgment as to Borg–Warner Corporation **REVERSED.** Order granting summary judgment as to Brake & Clutch Company of Philadelphia **REVERSED.** Order granting summary judgment as to Carlisle Companies Incorporated **REVERSED.**

Case **REMANDED** as to Borg–Warner Corporation, Brake & Clutch Company of Philadelphia, and Carlisle Companies Incorporated. Order granting summary judgment as to McCord Corporation **AFFIRMED.** Jurisdiction **RELINQUISHED.**