J-A01028-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| DEBBIE MULLEN, ADMINISTRATRIX OF THE ESTATE OF JAMES MYERS | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 2268 EDA 2021 |
| AMERICAN CIRCUIT BREAKER CORPORATION, BALDOR ELECTRIC COMPANY, CHAMPLAIN CABLE CORPORATION, COOPER INDUSTRIES, CROUSE-HINDS, FIVES NORTH AMERICAN COMBUSTION, INC., GENERAL CABLE TECHNOLOGIES CORPORATION, INTRICON CORPORATION, JOHNSON CONTROLS, INC., KERITE COMPANY, KILLARK, SELAS HEAT TECHNOLOGY, SIEMENS INDUSTRY, INC., THE HITE COMPANY | : : : : : : : : : : : : : | |

Appeal from the Order Entered October 14, 2021
In the Court of Common Pleas of Philadelphia County
Civil Division at No(s): 191001898

BEFORE: LAZARUS, J., NICHOLS, J., and McCAFFERY, J.

MEMORANDUM BY NICHOLS, J.: **FILED APRIL 4, 2023**

Appellant Debbie Mullen, administratrix of the estate of James Myers, appeals from the order granting summary judgment in favor of Appellee IntriCon Corporation.[1] Appellant argues that there are genuine issues of

_____

[1] Appellee IntriCon Corporation was formerly known as Selas Corporation of America. **See** Compl., 10/18/19, at ¶H; **see also** Appellee's Mot. for Summ.
*(Footnote Continued Next Page)*

material fact concerning James Myers' (Decedent) exposure to asbestos and subsequent development of mesothelioma. After careful review, we agree with Appellant and reverse and remand for further proceedings.

The trial court summarized the relevant facts of this case as follows:

[Decedent] James Myers died on March 23, 2018. This suit followed on October 18, 2019. The complaint alleges [Decedent] contracted mesothelioma during his time working at Sunbeam Equipment Corporation (Sunbeam) from 1967 to 2017.[2] [Decedent] was not deposed before his death. In opposition to summary judgment, [Appellant] offered deposition testimony from numerous co-workers of [Decedent] in an attempt to establish that he was regularly exposed to asbestos from valves and burners manufactured by [Appellee].

Sunbeam manufactured heat-treating furnaces and incinerators. [Appellee] was identified as the manufacturer of "Firecheck" safety valves that were installed in the furnaces at Sunbeam. Shipments of [Appellee's] Firecheck valves came in "every other week."

The Firecheck valves contained a "rope gasket" inside. The rope gasket came already installed in the device but sometimes it would be "bad" and had to be replaced. Workers would remove the old gasket and replace it with a new one from Sunbeam's storeroom. Removing the old gasket would create "a little bit of dust." George Carl, a trades helper who worked at Sunbeam at the same time as [Decedent], testified that the rope he removed from the Firecheck valves "looked like our standard asbestos rope" and that is what would be used to replace the rope in the Firecheck valves. Mr. Carl never saw documentation that the rope contained asbestos. Mr. Carl believed the replacement rope was manufactured by Johns Manville. Mr. Carl also testified that based

_____

J., 9/10/20, at 2, 5. For clarity, we refer to both Selas Corporation of America and IntriCon Corporation as Appellee.

[2] It is undisputed that Sunbeam was subsequently known as SECO/Warwick. *See*, *e.g.*, N.T. George Carl Dep., 7/1/20, at 16, 181; Order, 1/28/21; Order, 4/7/21.

on his personal experience the gaskets used in the Firecheck valves looked like asbestos.

Mr. Carl testified that [Decedent] would be in the "vicinity" or "right next to" Mr. Carl while he worked with the gaskets and rope on the Firecheck valve. Mr. Carl testified that different electricians would be nearby while he performed the removal and estimated about a quarter of the time it would be [Decedent].

[Decedent] worked in the electrical shop at Sunbeam. Electricians would wire equipment in the electrical shop and when any component of the furnaces needed to be electrified, the electricians, including [Decedent], would come out of the electric shop and into the assembly bays. The furnaces manufactured by Sunbeam had an electrical component and at some point during the building of a furnace[,] the electricians at Sunbeam would run conduit, pipe, and wire into the furnace. Sunbeam could manufacture approximately 150 furnaces a year and all of these would require electrical components.

Gary Praisner, another of [Decedent's] coworkers, testified that asbestos rope and cloth would be cut in the general assembly bay of the facility and this would create dust that would go into the air. Asked "would [Decedent] have breathed in dust from this asbestos rope that was used throughout the years that you were there at the Sunbeam plant?" Mr. Praisner answered in the affirmative.

In her response to the summary judgment motion, [Appellant] attached as an exhibit what are purportedly purchase orders of [Appellee's] burners and Firecheck valves to Sunbeam dated from September 19, 1964, to March 11, 1974. The purchase orders did not reference asbestos.

Trial Ct. Op., 5/27/22, at 2-3 (citations and footnote omitted, formatting altered).

Appellant initiated the underlying action against Appellee and thirteen other defendants on October 18, 2019. Compl., 10/18/19. On September 10, 2020, Appellee filed a motion for summary judgment. Appellee's Sum. Jud. Mot., 9/10/20. The trial court granted Appellee's motion for summary

judgment on March 26, 2021. Order, 3/26/21. Appellant filed a motion for reconsideration on April 16,2021, which the trial court denied on April 22, 2021. Excluding Appellee, the case ultimately settled as to all remaining non-bankrupt parties, with the exception of the dismissal of one defendant without prejudice to be reopened as an arbitration matter. *See* Order, 10/14/21. Appellant filed a notice of appeal on November 2, 2021. Both the trial court and Appellant complied with Pa.R.A.P. 1925.

We note that an order "declaring a case settled as to all remaining parties renders prior grants of summary judgment final for [Pa.R.A.P.] 341 purposes,[3] even if the prior orders entered disposed of fewer than all claims against all parties." *Harahan v. AC & S, Inc.*, 816 A.2d 296, 297 (Pa. Super. 2003) (citation omitted); *see also Shellenberger v. Kreider Farms*, 288 A.3d 898, 905 n.6 (Pa. Super. 2023) (addressing timeliness of an appeal and finality of a nearly identical order in a similar procedural posture). Moreover, we conclude Appellant's November 2, 2021 notice of appeal was timely as it was filed within thirty days[4] from the entry of the October 14, 2021 order.[5]

_____

[3] *See* Pa.R.A.P. 341 (addressing finality of orders, generally).

[4] *See* Pa.R.A.P. 903(a) (providing that an appeal "shall be filed within 30 days after the entry of the order from which the appeal is taken").

[5] On January 28, 2022, this Court issued an order to show cause why the appeal should not be quashed. Order, 1/28/22. The show cause order noted that the trial court's October 14, 2021 order reflected that the case was "settled as to all non-bankrupt parties except the Manville Fund without prejudice. Case dismissed against Manville Fund without prejudice to be
*(Footnote Continued Next Page)*

*See Quinn v. Bupp*, 955 A.2d 1014, 1020 (Pa. Super. 2008) (stating that

"[i]nterlocutory orders that are not subject to immediate appeal as of right

may be reviewed in a subsequent timely appeal of a final appealable order or

judgment" (citations omitted)); *see also Shellenberger*, 288 A.3d at 905

n.6. Accordingly, we conclude that this appeal is properly before this Court.

On appeal, Appellant raises the following issue:

Did the [trial] court abuse its discretion or err as a matter of law
in ruling that [Appellee] was entitled to summary judgment based

_____

reopened as an arbitration matter." *Id.* Further, the show cause order correctly stated that an order directing a matter to arbitration is not a final, appealable order. *See id.* (citing *Pennsy Supply, Inc. v. Mumma*, 921 A.2d 1184, 1194 (Pa. Super. 2007)). Appellant filed a timely response explaining that the October 14, 2021 order did not "direct" the case to arbitration, but rather the October 14, 2021 order "merely noted that its dismissal order will not be an absolute bar to one of the settled defendants litigating its contribution claim against [the Manville Fund]." Appellant's Resp., 2/7/22. On February 22, 2022, this Court discharged the show cause order. However, we may address the issue of appealability *sua sponte* because it affects our jurisdiction. *See Jahanshahi v. Centura Dev. Co., Inc.*, 816 A.2d 1179, 1183 (Pa. Super. 2003); Pa.R.A.P. 341(a). Nevertheless, upon review, we conclude that the October 14, 2021 order is final for purposes of appellate jurisdiction. We agree with Appellant that the October 14, 2021 order did not order arbitration, but rather, it provided the possibility for pursuit of arbitration and stated that the case was concluded as to the other defendants. *See* Appellant's Brief at 10; Order, 10/14/21. Additionally, the October 14, 2021 order utilized language that this Court has previously deemed final for purposes of perfecting appellate jurisdiction. *See Shellenberger*, 288 A.3d at 905 n.6; *see also Weible v. Allied Signal, Inc.*, 963 A.2d 521 (Pa. Super. 2008). Indeed, the *Weible* Court stated: "In this case all parties are now settled, bankrupt, or dismissed by grant of summary judgment or otherwise. Consequently, the grants of summary judgment for [the appellees] are final orders for appeal purposes and the present appeal is properly within our jurisdiction." *Weible*, 963 A.2d at 525 (citing, *inter alia*, *Harahan*, 816 A.2d at 297). Accordingly, we discern no impediment to our appellate jurisdiction in the instant matter. *See Shellenberger*, 288 A.3d at 905 n.6; *Weible*, 963 A.2d at 525; *Harahan*, 816 A.2d at 297.

on [Appellant's] alleged failure to show [D]ecedent's exposure to [Appellee's] asbestos-containing products?

Appellant's Brief at 4.

Appellant contends that the trial court erred in concluding that she failed to meet the product identification and exposure requirements to survive a motion for summary judgment. *See id.* at 15. Specifically, Appellant contends that the trial court erred when it found that Appellant could not satisfy the frequency, regularity, and proximity test for asbestos liability cases. *Id.* at 15-16. Appellant contends that a witness, Mr. George Carl identified Appellee's asbestos-containing product and satisfied the frequency, regularity, and proximity test. *See id.* at 17-21.

Appellee responds that summary judgment was proper because Appellant failed to establish that Decedent was exposed to asbestos fibers from Appellee's product, the firecheck valves. Appellee's Brief at 12. Further, Appellee argues that Appellant did not establish that Appellee's product contained asbestos. *See id.* at 12-14. Accordingly, Appellee asserts that Appellant cannot satisfy the frequency, regularity, and proximity test, and Appellant's claim is based on speculation. *See id.* at 18-21.

This Court's scope and standard of review are well settled:

Our scope of review of an order granting summary judgment is plenary. We apply the same standard as the trial court, reviewing all the evidence of record to determine whether there exists a genuine issue of material fact. We view the record in the light most favorable to the non-moving party, and all doubts as to the existence of a genuine issue of material fact must be resolved against the moving party. Only where there is no genuine issue as to any material fact and it is clear that the moving party is

- 6 -

entitled to a judgment as a matter of law will summary judgment be entered.

Motions for summary judgment necessarily and directly implicate the plaintiff's proof of the elements of [her] cause of action. Summary judgment is proper if, after the completion of discovery relevant to the motion, including the production of expert reports, an adverse party who will bear the burden of proof at trial has failed to produce evidence of facts essential to the cause of action or defense which in a jury trial would require the issues to be submitted to a jury. Thus, a record that supports summary judgment will either (1) show the material facts are undisputed or (2) contain insufficient evidence of facts to make out a prima facie cause of action or defense and, therefore, there is no issue to be submitted to the jury. Upon appellate review, we are not bound by the trial court's conclusions of law, but may reach our own conclusions. The appellate Court may disturb the trial court's order only upon an error of law or an abuse of discretion.

Judicial discretion requires action in conformity with law on facts and circumstances before the trial court after hearing and consideration. Consequently, the court abuses its discretion if, in resolving the issue for decision, it misapplies the law or exercises its discretion in a manner lacking reason. Similarly, the trial court abuses its discretion if it does not follow legal procedure.

Where the discretion exercised by the trial court is challenged on appeal, the party bringing the challenge bears a heavy burden.

It is not sufficient to persuade the appellate court that it might have reached a different conclusion if . . . charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill will, as shown by the evidence or the record, discretion is abused.

***National Cas. Co. v. Kinney***, 90 A.3d 747, 752-53 (Pa. Super. 2014)

(citations omitted and formatting altered).

To survive a motion for summary judgment in asbestos litigation, it is well settled that the plaintiff must present sufficient evidence establishing product identification. *Eckenrod v. GAF Corp.*, 544 A.2d 50, 52 (Pa. Super. 1988). Additionally:

> the plaintiff must establish that the injuries were caused by a product of a particular manufacturer or supplier. *Vanaman v. DAP, Inc.*, 966 A.2d 603, 607 (Pa. Super. 2009) (*en banc*). In other words, the plaintiff must present some evidence that he inhaled asbestos fibers shed by the specific manufacturer's product. *Gutteridge v. A.P. Green Services, Inc.*, 804 A.2d 643, 652 (Pa. Super. 2002). As a result, the plaintiff must do more than just show the mere presence of asbestos in the workplace. Instead, the plaintiff must prove he worked in the vicinity of a specific manufacturer's product.
>
> When evaluating the plaintiff's evidence in asbestos cases at the summary judgment stage, Pennsylvania courts use the frequency, regularity, and proximity test established in *Eckenrod*. *Gregg v. V-J Auto Parts, Co.*, 943 A.2d 216, 227 (Pa. 2007). In *Gregg*, our Supreme Court adopted the *Eckenrod* standard and held that courts should make a reasoned assessment of whether, in light of the evidence on the frequency, regularity, and proximity of a plaintiff's alleged exposure, a jury could draw a sufficient causal connection between the defendant's product and the asserted injury. *Id.* at 227. Therefore, the relevant inquiry under a manufacturer's motion for summary judgment is whether a plaintiff has pointed to sufficient material facts in the record to indicate that there is a genuine issue of material fact as to the causation of decedent's disease by the product of each particular defendant. *Vanaman*, [966 A.2d] at 607. *See also Rost v. Ford Company*, 151 A.3d 1032 (Pa. 2016) (emphasizing that "frequent, regular, and proximate" test in this context requires evidence of exposure sufficient to allow jury to infer causal connection between exposure to asbestos-containing products and development of mesothelioma).
>
> *Eckenrod*, however, is not a rigid test that sets an absolute threshold required to support liability. *Gregg*, 943 A.2d at 225. Rather, courts should apply *Eckenrod* in an evaluative fashion, in a way tailored to the facts and circumstances of the case. *Linster*

> ***v. Allied Signal, Inc.***, 21 A.3d 220, 224 (Pa. Super. 2011). Application of the test becomes less stringent where the plaintiff produces specific evidence of exposure to a defendant's product. ***Id.*** Similarly, in cases involving mesothelioma, the frequency and regularity requirements should become "less cumbersome." ***Id.*** A plaintiff cannot survive summary judgment, however, if a jury would need to speculate to find in plaintiff's favor. ***Krauss v. Trane U.S. Inc.***, 104 A.3d 556, 568 (Pa. Super. 2014).

***Kardos v. Armstrong Pumps, Inc.***, 222 A.3d 393, 399-400 (Pa. Super. 2019) (some citations omitted and formatting altered).

Here, the trial court concluded that Appellant failed to present evidence that Appellee's product contained asbestos or that Decedent was exposed to dust from Appellee's product on a regular, frequent, and proximate basis. Trial Ct. Op., 5/27/22, at 5. The trial court found that none of Appellant's witnesses testified that Appellee's firecheck valves contained asbestos and that Appellant's witness, Mr. George Carl, stated only that the material he removed from the firecheck valves "looked like" asbestos. ***Id.*** (citing R.R. 240a-241a).[6] The trial court concluded that this testimony was insufficient to establish that Appellee's firecheck valve contained asbestos because it would require the finder of fact to speculate. ***See id.*** Additionally, the trial court held that Appellant's witnesses offered only conjecture concerning whether Decedent inhaled any dust produced by Appellee's product, and "even if" Appellant proffered evidence to show Appellee was responsible for providing asbestos-containing products to Sunbeam, there is insufficient evidence from which a jury could conclude that Decedent was regularly, frequently, and

_____

[6] We may refer to the reproduced record for the parties' convenience.

proximately exposed to asbestos. *Id.* at 6. After careful review, we are constrained to disagree.

As stated previously, Appellant must show that that Decedent was frequently, regularly, and proximately exposed to asbestos fibers from Appellee's product to permit a jury to infer causal connection between Decedent's exposure to asbestos and Decedent's development of mesothelioma. *See Kardos*, 222 A.3d at 399. In cases involving mesothelioma, the frequency and regularity requirements are less cumbersome. *See id.* at 400.

Here, it is undisputed that Decedent worked at Sunbeam and that Sunbeam manufactured heat-treating furnaces. Trial Ct. Op., 5/27/22, at 2. While employed at Sunbeam, Decedent developed mesothelioma. *See id.* Decedent worked as an electrician and built electrical panels for the furnaces at Sunbeam. *See* R.R. 257a-264a. During the manufacturing process, electricians would leave the electrical shop and come to the assembly floor where the furnaces built. Electricians would then wire the furnaces and connect the electrical panels to the furnaces for testing. *See id.* at 260a-264a.

Mr. Gary Praisner, who worked at Sunbeam during the time Decedent worked there, testified that asbestos was used at Sunbeam. *See id.* at 108a-111a. Mr. Praisner testified that scrap material, including asbestos, was swept-up and the dust was scattered all over the assembly floor. *See id.* at 111a-119a. Mr. Praisner stated that Sunbeam made approximately 150-200

furnaces per year, and some of the furnaces had as many as fifty burners. *See id.* at 125a. He explained that each furnace required asbestos gaskets and the use of asbestos caused dust. *See id.* at 125a-126a. Mr. Praisner stated that Decedent breathed in this dust. *See id.* at 127a.

Mr. Peter Fizer, who was also employed at Sunbeam when Decedent worked there, testified that although Decedent worked in the electrical shop, Decedent also came to the assembly floor. *See id.* at 134a. Mr. Fizer testified that there was dust all over the assembly floor. *See id.* at 140a.

Mr. George Carl was employed at Sunbeam at the same time Decedent. *See* R.R. 223a. Mr. Carl and Mr. Edward Burdick, another Sunbeam employee who worked at Sunbeam when Decedent worked there, testified that Appellee's predecessor in interest, Selas Corporation, manufactured firecheck valves that were used in the production of furnaces at Sunbeam. *See id.* at 225a, 235a, 284a.

Moreover, Mr. Carl testified further that he routinely worked with asbestos rope and asbestos gaskets while employed at Sunbeam. *See id.* at 218a-219a. With respect to asbestos, Mr. Carl said that he worked with "miles" of it. *See id.* at 218a. Further, Mr. Carl explained that Sunbeam built furnaces containing burners, and each burner had a firecheck valve. *See id.* at 226a.

Mr. Carl identified Appellee's firecheck valve and confirmed working with Appellee's firecheck valve during the assembly process. *See id.* at 231a-232a. Mr. Carl stated that the firecheck valve was installed close to the burner

- 11 -

in the furnaces Sunbeam built. *See id.* at 220a, 226a. The firecheck valves arrived at Sunbeam containing rope packing. *See id.* at 232a, 238a, 241a. Mr. Carl stated that the rope "looked like our standard asbestos rope." *See id.* at 240a. Mr. Carl further testified that in some instances, this packing inside Appellee's firecheck valve had to be replaced, and this required Mr. Carl to remove the packing that came from Appellee's product and was inside Appellee's firecheck valve. *See id.* at 226a-228a. Mr. Carl said that approximately ten to fifteen percent of the time, the rope packing in the firecheck had to be removed and replaced. *See id.* at 233a, 234a. Mr. Carl testified that when he had to scrape out and remove the old packing it would shred and come out in pieces. *See id.* at 233a. The removal of the old packing created dust. *See id.* at 238a. Mr. Carl noted that although he was "not a chemist," he stated that the material looked like asbestos, and it would shred like asbestos. *Id.* at 232a, 246a. Mr. Carl also explained that when the gaskets shredded and had to be replaced, they were replaced with more asbestos. *See id.* at 221a, 241a, 243a.

Mr. Carl also testified that Sunbeam employees were "all over the plant," and they would breathe in each other's dust. *Id.* at 162a. Mr. Carl noted that when Decedent was in the electrical shop, he was removed from the dust on the manufacturing floor. *See id.* at 224a. However, Mr. Carl explained that in order to install the electrical wiring, Decedent had to come out onto the manufacturing floor, and he stood right beside Mr. Carl. *See id.* Mr. Carl said that he did not work with Decedent all the time, but when he did, Decedent

worked right next to him. *See id.* at 247a, 248a. Mr. Carl noted that there were other electricians, but Decedent was with him twenty-five percent of the time. *See id.* at 248a. As noted, Mr. Carl unequivocally testified that when he had to remove the packing from Appellee's firecheck, this removal process created dust. *See id.* at 223a, 247a. Mr. Carl testified that he had to scrape out the old gaskets approximately ten to fifteen percent of the time, and he said that Decedent was working "right next to me" and "in the vicinity" when Mr. Carl tore apart or scraped out the old gasket in the firecheck and replaced it. *See id.* at 223a-224a, 233a, 234a, 247a. When Mr. Carl was asked if he knew what the material inside the firecheck valve was, he responded: "It looked like our standard asbestos rope. That's what we would put in. It was a white rope. It looked just like the asbestos rope." *See id.* at 240a-241a. Mr. Carl also testified that he regularly observed asbestos, and these observations caused him to be able to recognize asbestos-containing rope and gaskets and conclude that the firecheck valves contained asbestos. *See id.* at 249a-250a.

This Court has previously stated:

> We conclude that on the record evidence before us concerning the frequency, regularity, and proximity of [the decedent's] asserted exposure to the [manufacturer's] product[,] a jury would be entitled to make the necessary inference of a sufficient causal connection between the [manufacturer's] product and [the decedent's] mesothelioma. This is not to say that a jury must make this inference. Contrary inferences are possible; even plausible. However, the parsing of possible or plausible contrary inferences that might be drawn from the evidence is not the

quintessence of summary judgment; it is the embodiment of a trial.

***Wright v. Allied Signal, Inc.***, 963 A.2d 511, 521 (Pa. Super. 2008). Moreover, in **Weible**, this Court reversed the trial court's order granting summary judgment in favor of defendants where the decedent's co-workers testified that, "in the presence of" the decedent, they worked on and replaced clutches, brakes, and gaskets, and this process of removing and replacing brakes, clutches, and gaskets produced asbestos dust. **Weible**, 963 A.2d at 528-32. We conclude that the same rationale applies here.

After review, we do not agree with the trial court that this case is so clear and free from doubt that Appellee was entitled to judgment as a matter of law. **See Kinney**, 90 A.3d at 752. Rather, we conclude that Appellant presented sufficient evidence to establish a genuine issue of material fact as to Decedent's contact with Appellee's product, and we conclude that the trial court erred in granting summary judgment where the facts sufficiently identified Appellee's product and the frequency, regularity, and proximity of Decedent's exposure to it. **See Korol v. Aurora Pump Co.**, 1373 EDA 2022, 2023 WL 1980858, at *7 (Pa. Super. filed Feb. 14, 2023) (unpublished mem.);[7] **see also Kardos**, 222 A.3d at 400 (noting that in cases where the complainant developed mesothelioma, "the frequency and regularity requirements should become 'less cumbersome'" (citation omitted)). After

---

[7] We may cite to unpublished memorandum decisions of this Court filed after May 1, 2019, for their persuasive value. **See** Pa.R.A.P. 126(b).

viewing the evidence in the light most favorable to Appellant, we conclude that Appellant is entitled to present, to a jury, the issue of whether there is a sufficient causal connection between the Appellee's products and Decedent's mesothelioma. ***See Korol***, 2023 WL 1980858, at *7 (citing ***Linster***, 21 A.3d at 229).

On this record, we reverse the order granting summary judgment and remand for further proceedings. ***See Korol***, 2023 WL 1980858, at *7 (citing ***Harahan***, 816 A.2d at 297-98 (providing that deposition testimony from decedent's co-workers provided circumstantial and direct evidence to show genuine issue of material fact as to whether the defendant's asbestos-containing product caused decedent's disease)); ***see also Wright***, 963 A.2d at 520-21.

Order reversed. Case remanded for further proceedings. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 4/4/2023

- 15 -