J-E02002-14

2014 PA Super 286

| DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |

AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP,

INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF:  CRANE CO.

No. 865 EDA 2011

Appeal from the Judgment Entered on February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON

IN THE SUPERIOR COURT OF
PENNSYLVANIA

v.

AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO.,

2

EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF:  HOBART BROTHERS CO.

No. 866 EDA 2011

Appeal from the Judgment Entered on February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE ESTATE OF JAMES NELSON

v.

AIRCO WELDERS SUPPLY, ALLIED SIGNAL (A/K/A ALLIED CORP.), AMERICAN STANDARD, A.W. CHESTERTON, INC., BASIC, INC., BAYER CROPSCIENCE, INC., (F/K/A AVENTIS

IN THE SUPERIOR COURT OF PENNSYLVANIA

3

CROPSCIENCE, USA, INC.), ACHEM PRODUCTS, INC., RHONE POULENC, AG CO. AND BENJAMIN FOSTER COMPANY, BEAZER EAST (A/K/A KOOPERS CO., INC. AND KOOPER), BIRD, INC., BOC GROUP, BORG-WARNER CORP., BRAND INSULATIONS, INC., CBS CORPORATION (F/K/A VIACOM, INC. AND WESTINGHOUSE ELECTRIC CORPORATION), CERTAINTEED CORPORATION, CHRYSLER CORP. (A/K/A AMC, NORTHWEST AUTO RENTAL CO. AND CHRYSLER SERVICE CONTRACT CO.), CRANE CO., DEMMING DIVISION, CRANE PACKING, ESAB WELDING AND CUTTING EQUIPMENT, EJ LAVINO & CO., EUTECTIC CORP., FERRO ENGINEERING, FORD MOTOR CO., FOSECO, INC., FOSTER WHEELER CORPORATION, GARLOCK, INC., GENERAL ELECTRIC COMPANY, GENERAL MOTORS CORP., GEORGE V. HAMILTON, INC., GEORGIA-PACIFIC CORPORATION, GOULD PUMPS, INC., GREEN, TWEED & COMPANY, INC., HAJOCA PLUMBING SUPPLY COMPANY, HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

APPEAL OF:  LINCOLN ELECTRIC CO.                    No. 867 EDA 2011

Appeal from the Judgment Entered on February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 1335 Dec. Term 2008

DARLENE NELSON, EXECUTRIX OF THE
ESTATE OF JAMES NELSON, AND IN HER
OWN RIGHT,

APPELLANT

v.

AIRCO WELDERS SUPPLY, ALLIED
SIGNAL (A/K/A ALLIED CORP.),
AMERICAN STANDARD, A.W.
CHESTERTON, INC., BASIC, INC., BAYER
CROPSCIENCE, INC., (F/K/A AVENTIS
CROPSCIENCE, USA, INC.), ACHEM
PRODUCTS, INC., RHONE POULENC, AG
CO. AND BENJAMIN FOSTER COMPANY,
BEAZER EAST (A/K/A KOOPERS CO.,
INC. AND KOOPER), BIRD, INC., BOC
GROUP, BORG-WARNER CORP., BRAND
INSULATIONS, INC., CBS CORPORATION
(F/K/A VIACOM, INC. AND
WESTINGHOUSE ELECTRIC
CORPORATION), CERTAINTEED
CORPORATION, CHRYSLER CORP. (A/K/A
AMC, NORTHWEST AUTO RENTAL CO.
AND CHRYSLER SERVICE CONTRACT
CO.), CRANE CO., DEMMING DIVISION,
CRANE PACKING, ESAB WELDING AND
CUTTING EQUIPMENT, EJ LAVINO & CO.,
EUTECTIC CORP., FERRO ENGINEERING,
FORD MOTOR CO., FOSECO, INC.,
FOSTER WHEELER CORPORATION,
GARLOCK, INC., GENERAL ELECTRIC
COMPANY, GENERAL MOTORS CORP.,
GEORGE V. HAMILTON, INC., GEORGIA-
PACIFIC CORPORATION, GOULD PUMPS,
INC., GREEN, TWEED & COMPANY, INC.,
HAJOCA PLUMBING SUPPLY COMPANY,

IN THE SUPERIOR COURT OF
PENNSYLVANIA

HARNISCHFEGER CORP., HEDMAN RESOURCES LIMITED (F/K/A HEDMAN MINES LTD.), HOBART BROTHERS CO., HONEYWELL INTERNATIONAL, INC., INGERSOLL RAND CO., JOY GLOBAL INC., LINCOLN ELECTRIC CO., LUKENS STEEL CO., MALLINCKRODT GROUP, INC. (F/K/A INTERNATIONAL MINERALS & CHEMICALS CORP.), MELRATH GASKET, INC., MINE SAFETY APPLIANCE (MSA), METROPOLITAN LIFE INSURANCE COMPANY, NOSROCK CORPORATION, OWENS-ILLINOIS, INC., PEP BOYS (A/K/A MANNY, MOE AND JACK), UNION CARBIDE CORP., UNIVERSAL REFRACTORIES DIVISION OF THIEM CORPORATION

No. 889 EDA 2011

Appeal from the Judgment Entered on February 23, 2011
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 1335 Dec. Term 2008

BEFORE:  FORD ELLIOTT, P.J.E., BENDER, P.J.E., BOWES, J., SHOGAN, J., ALLEN, J., OTT, J., WECHT, J., STABILE, J., AND JENKINS, J.

DISSENTING OPINION BY WECHT, J.:          **FILED DECEMBER 23, 2014**

I write principally to note my respectful dissent from the learned majority's resolution of a dispositive question regarding the admission of expert testimony, which I fear sets a precedent that will narrow further the avenues for relief available to plaintiffs who suffered often-fatal injury from extensive exposure to asbestos.  I also disagree with the majority's holding that comments made in the closing argument of counsel for plaintiff Darlene Nelson ("Appellee") require us to intrude upon the trial court's discretion in denying Appellants relief.

6

I begin, however, by noting one point upon which I agree with the heart of the majority's analysis but differ with its result. The majority's discussion and analysis of the intended-user constraint on strict products liability litigation is among the finest I have seen. *See* Maj. Op. at 27-31. The majority relates with clarity and probity the contours of a restriction upon such claims that has bedeviled Pennsylvania courts. The majority distills from existing law an excellent account of what constitutes an intended use, and I join that analysis.

That being said, I cannot join the majority's application of that doctrine in the instant case. The majority finds insufficient evidence from which the jury could have concluded that James Nelson's use of Crane's sheeting constituted an intended use or that Nelson was an intended user of that product. Furthermore, even if there was sufficient evidence to establish intended use by an intended user, the majority finds that the court's jury charge was insufficient to put that question squarely before the jury. I do not dispute the general accuracy of the majority's characterization of the record. And yet, for two reasons neither of these points of agreement permits me to join the majority in reversing the trial court's ruling on this issue.

It is hornbook law that the decision of whether or not to admit evidence lies in the trial court's discretion. The contested exclusion of evidence will not furnish grounds for relief unless the court abuses its discretion. *McManamon v. Washko*, 906 A.2d 1259, 1274

(Pa. Super. 2006). Moreover, "[t]o constitute reversible error, a ruling on evidence must be shown not only to have been erroneous but harmful to the party complaining. An evidentiary ruling which did not affect the verdict will not provide a basis for disturbing the fact-finder's judgment." **Peled v. Meridian Bank**, 710 A.2d 620, 626 (Pa. Super. 1998) (internal quotation marks and modifications omitted); **see Kremer v. Janet Fleisher Gallery, Inc.**, 467 A.2d 377, 388 (Pa. Super. 1983) ("A new trial will not be granted where the evidence would not have affected the verdict.").

The same proposition holds for errors in jury instructions, which will provide grounds for overturning a verdict only when they are not harmless in context. **Stevens v. SEPTA**, 518 A.2d 810, 813-14 (Pa. Super. 1986). Indeed, our review of any claims seeking a new trial must be "grounded firmly in the harmless error doctrine[], which underlies every decision to grant or deny a new trial. A new trial is not warranted merely because some irregularity occurred during the trial . . .; the moving party must demonstrate to the trial court that he or she has suffered prejudice from the mistake." **Egan v. UISI Mid-Atlantic, Inc.**, 92 A.3d 1, 11 (Pa. Super. 2014).

The majority's analysis makes clear that, to find Crane strictly liable, Appellee had the burden of establishing that Nelson was an intended user and that the sheeting manufactured by Crane and used by Nelson was unsafe for want of an adequate warning. The majority's analysis, however, compels the conclusion that Nelson was an intended user, that his

8

interaction with the asbestos sheeting was consistent with its intended use, and that the product had no warning whatsoever. While Crane observes that the trial court prevented it from presenting evidence regarding its product's intended use, it does not specify what evidence it had to present on that point. This is problematic insofar as Crane conceded that, in its intended use as a gasket material, the sheeting would have to be cut to fit the application precisely as Nelson attested he did to make the sheeting suit his purposes.

In order to establish prejudice arising from the evidentiary ruling and the jury charge, Crane effectively must rely on its own more narrow definition of "intended user," which the majority correctly rejects: Fact-finding, however trivial, might be warranted if establishing that the intended **end** use was the governing consideration. However, the majority correctly concludes that, where steps toward the intended end use are common to different end uses, the manufacturer may still be liable. Under this rubric, Crane effectively admitted that its product was used as intended, *i.e.*, Nelson cut the sheeting to size in the same manner an intended end user would have done to facilitate the intended end use. Crane's lack of foundation for establishing prejudice on this point is underscored by its conclusory proffer: Crane offers no comment as to how its intended evidence would have been such that a jury might have ruled otherwise than it did had it been charged with the intended use doctrine as explained by the majority.

In finding Crane liable, the jury credited Nelson's testimony that he used Crane's product in the way that he attested. The jury also concluded that the sheeting contained and emitted asbestos in sufficient amounts to have caused Nelson's mesothelioma. Finally, the jury concluded that Crane had a duty to warn of hazards associated with its product and that Crane breached that duty. These findings, paired with Crane's lack of a non-conclusory assertion or proffer to the effect that Nelson's cutting of the product differed in any material way from another user's performance of the same act, lead me to conclude that there was, essentially, no dispute of material fact relative to intended use for the jury to resolve. While the presence of any doubt on these points would militate in favor of a clearer jury charge on the question, and while the trial court apparently misconstrued the interplay between failure to warn liability and the intended user principle, I believe that Crane has failed to establish that the errors complained of could have changed the outcome of the jury's determination of liability. Consequently, I dissent from the result reached by the majority, notwithstanding its excellent analysis of the applicable law.

Turning to the next issue, I respectfully dissent from the learned majority's determination that the testimony of Daniel DuPont, D.O., was subject to exclusion as a matter of law pursuant to **Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923), based upon our Supreme Court's decision in **Betz v. Pneumo Abex, LLC**, 44 A.3d 27 (Pa. 2012). While **Betz** is the most recent in a series of opinions circumscribing the range of expert

testimony that may be admitted to establish substantial causation in asbestos litigation,[1] I do not believe that it is dispositive of the case at bar. Both **Betz** and **Gregg v. V-J Auto Parts, Co.**, 943 A.2d 216 (Pa. 2007), which **Betz** was at pains to harmonize, concerned cases in which substantial causation rose or fell **solely** upon the "any-exposure" theory of causation that now undisputedly is disfavored under Pennsylvania law. In those cases, plaintiffs could not produce any evidence of greater than *de minimis* exposure to asbestos emitted from the defendants' products. Thus, liability could be established **only** if expert testimony based upon the any-exposure theory was admitted and credited by the jury.

The case before us, however, is distinguishable. James Nelson undisputedly was exposed regularly to numerous asbestos-containing

---

[1] Our Supreme Court recently granted allowance of appeal in yet another related case. **See Rost v. Ford Motor Co.**, 309 EAL 2014, 2014 WL 5800550 (Pa. Nov. 6 2014) (granting review of the question "[w]hether . . . a plaintiff in an asbestos action may satisfy the burden of establishing substantial-factor causation by an expert's 'cumulative-exposure' theory that the expert concedes is simply an 'any-exposure' theory by a different name"). In **Rost**, a decision that does not bind this panel, **see Commonwealth v. Morris**, 958 A.2d 569, 580 n.2 (Pa. Super. 2008) (*en banc*) ("[T]his Court, sitting *en banc*, may overrule the decision of a three-judge panel of this Court."), this Court ruled that **Betz** did not control a trial court's decision not to grant a new trial, because, unlike in **Betz**, plaintiff's experts testified in great detail to the mechanisms by which the asbestos fibers in question could cause mesothelioma. **See Rost v. Ford Motor Co.**, 404 EDA 2012 (Pa. Super. May 19, 2014). While **Rost** differs from this case in certain regards, I believe that its analysis, which in many ways echoes my own, was sound.

products over many years. **See** Maj. Op. at 8-9. Moreover, he testified to frequent, regular, and proximal use[2] of and exposure to products manufactured by Appellants that contained asbestos that could be released into the air under certain conditions. **See, e.g.**, Notes of Testimony Nelson Deposition ("Nelson Depo.") at 63-76, 113, 115, 117 (regarding extensive use of welding rods manufactured by Hobart and Lincoln); **id.** at 186-99 (regarding use of Cranite sheeting that was heavy for two months, frequent for two years, and less frequent in the years that followed).[3] Unlike Dr. Maddox in **Betz**, who was unfamiliar with the plaintiff's medical history, Dr. DuPont acquainted himself with Nelson's medical records and his history of exposure to products that allegedly released respirable asbestos fibers. **See** Notes of Testimony DuPont deposition ("DuPont Depo."), 8/11/2010, at 26-27, 34-37, 49, 121-27. Moreover, unlike Dr. Maddox in **Betz**, Dr. DuPont had a lengthy history of treating individuals with a history of occupational exposure to asbestos. Conversely, in **Betz**, Dr. Maddox was

---

[2] The well-established frequency, regularity, and proximity test governs the sufficiency of proof to establish sufficient exposure to a given product to establish substantial causation. **See Weible v. Allied Signal, Inc.**, 963 A.2d 521, 525 (Pa. Super. 2008) (citing **Eckenrod v. GAF Corp.**, 544 A.2d 50 (Pa. Super. 1988)). The majority does not find it necessary to discuss this test, despite its predominance in asbestos litigation and essential questions, highlighted *infra*, regarding its relationship with the problematic expert testimony at issue in this case.

[3] Nelson's deposition spanned several days, but is paginated continuously across the transcripts.

called to testify only as to the any-exposure theory to establish substantial causation in that case, and did not testify to the plaintiff's exposure history. In the instant case, Dr. DuPont testified that Nelson's extensive exposure over decades to respirable asbestos, albeit from myriad products, was the substantial cause of his mesothelioma.

Notably, Dr. DuPont, while acknowledging a degree of dose-responsiveness[4] in mesothelioma, testified that the necessary exposure to cause mesothelioma was diminished relative to other asbestos-related diseases such as pleural thickening and asbestosis. Specifically, he indicated that "[m]alignant mesothelioma occurs with significant asbestos exposure, but it does not require the dose or duration or intensity of exposure that other diseases do." *Id.* at 31-32. Dr. DuPont's reference to "significant asbestos exposure" also illustrated that his testimony regarding causation was not contingent upon the validity of an any-exposure theory of causation, notwithstanding that, speaking generally and in concert with many others, he endorsed such a view.

_____

[4] "With dose-responsive ailments, generally, exposure to higher levels carries with it a higher risk, and exposure to lower levels is accompanied by a reduced risk." *Betz*, 44 A.3d at 53 & n.33 (quoting *Indus. Union Dep't, AFL-CIO v. Amer. Petroleum Inst.*, 448 U.S. 607, 632 n.33 (1980)). That asbestos-related diseases are fundamentally dose-responsive is uncontroversial. *See id.* at 33 (acknowledging any-exposure theory as a matter of general causation, and finding it problematic only when "extrapolated down" to establish substantial causation).

The majority's reading of **Betz** transforms expert testimony acknowledging the essentially uncontroversial proposition that there are "no innocent fibers" of asbestos into a totem that precludes the admission of that expert's testimony as a matter of law, no matter the quantum of case-specific evidence of the plaintiff's exposure to a given product. Maj. Op. at 17-25. That interpretation and its application to this case are problematic inasmuch as the exposure at issue in **Betz**, as in **Gregg**, was *de minimis*, rendering the any-exposure testimony indispensable to a finding of substantial causation. **See Betz**, 44 A.3d at 30 (noting the exposure at issue arose from occasional work with asbestos-containing brake components during decedent's career as a mechanic); **Gregg**, 943 A.2d at 217-18 (explaining that the exposure at issue was "focused on Mr. Gregg's personal automotive activities," *i.e.*, exposure arising from his occasional work with asbestos-containing brake components); **cf. Betz**, 44 A.3d at 58 (concluding that "a complete discounting of the substantiality in exposure would be fundamentally inconsistent with Pennsylvania law"). For precisely this reason, the **Betz** litigation was chosen as a "test case" on the question of whether any-exposure testimony could be sufficient, **without more**, to establish substantial causation in cases of *de minimis* exposure. **Betz**, 44 A.3d at 30; **see id.** at 55 (observing that "plaintiffs repeatedly advised [the trial court] that there was no need for them to discuss individual exposure histories, so long as they could establish exposure to at least a single fiber from each defendant's product," and that Dr. Maddox

14

"rendered his opinion without being prepared to discuss the circumstances of any individual's exposure"). ***Betz*** answered the question with a resounding "No." However, the ***Betz*** question simply is not posed by this case.

Substantial exposure to many products does not equate to substantial exposure to one or more of Appellants' products. But that Dr. DuPont was unable to testify to the relative exposure to each product does not preclude submission of the case to a jury regarding the degree of exposure to Appellants' products. No Pennsylvania court has held that product identification and the nature of a plaintiff's exposure must be established by expert testimony on peril of dismissal. ***See Weible v. Allied Signal, Inc.***, 963 A.2d 521, 527 (Pa. Super. 2008) (holding that "[t]he nexus between an asbestos product and plaintiff may be established by direct and circumstantial evidence," and that testimony by someone "with knowledge relating to the plaintiff's workplace exposure to an asbestos-containing product is admissible"); ***Andaloro v. Armstrong World Indust., Inc.***, 799 A.2d 71, 86 (Pa. Super. 2002) (quoting ***Coward v. Owens-Corning Fiberglas Corp.***, 729 A.2d 614, 622-23 (Pa. Super. 1999)) ("In asbestos litigation, evidence is sufficient to establish product identity where the record shows that plaintiff inhaled asbestos fibers shed by that manufacturer's specific product. The evidence . . . must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product, and that his contact with it was of such a nature as to raise a reasonable inference

that he inhaled asbestos fibers that emanated from it."); *accord Junge v. Garlock Inc.*, 629 A.2d 1027 (Pa. Super. 1993).

In *Junge*, this Court made the following observation:

> Our case law includes no requirement that a plaintiff in an asbestos case prove through an industrial hygienist, or any other kind of opinion witness, *how many asbestos fibers are contained in the dust emissions from a particular asbestos[-]containing product*. Instead, in order to make out a *prima facie* case [sufficient to avoid summary judgment], it is well[-]established that the plaintiff must present evidence that he inhaled asbestos fibers shed by the specific manufacturer's product. A plaintiff must establish more than the presence of asbestos in the workplace; he must prove that he worked in the vicinity of the product's use.

*Id.* at 1029 (emphasis in original; citation omitted). Thus, despite the presence of problematic any-exposure testimony, the *Gregg* Court declined to rule upon "whether, in light of [the a]ppellee's evidence concerning the frequency, regularity, and proximity of Mr. Gregg's exposure to asbestos-containing products sold by Appellant, the common pleas court correctly determined that a jury issue was not present." 943 A.2d at 227. The *Betz* Court showed similar restraint in not conflating the aspects of the substantial causation inquiry that must be addressed by an expert and those concerning actual exposure that may be resolved by lay evidence. *See* 44 A.3d at 55 n.34.

In *Junge*, we held that the plaintiff had made out a *prima facie* case requiring submission to a jury based upon his own positive identification of the product in question, his own testimony that he worked in close proximity

16

to the product on a regular basis and that his work produced dust, and the manufacturer's acknowledgment that the product in question contained and emitted asbestos. 629 A.2d at 1029-20. Nelson's testimony in this case is quite similar, and neither **Betz** nor **Gregg** undermines **Junge**'s ruling in that regard. Indeed, **Gregg** echoed that proposition. **See Gregg**, 943 A.2d at 290 (noting that the frequency, regularity, and proximity factors "are to be applied . . . as an aid in distinguishing cases in which the plaintiff can adduce evidence that there is a sufficiently significant likelihood that the defendant's product caused his harm from those in which such likelihood is absent on account of only casual or minimal exposure to the defendant's product").

In contravention of this consistently-applied rule, the majority holds that "the questions **an expert must answer** in order to establish that [a defendant's] products were a substantial factor in causing" the plaintiff's disease include whether exposure to a given product was above a non-negligible level and that the given product "did it," *i.e.*, was itself the cause of the disease, evidently to the exclusion of all other products. Maj. Op. at 24 (emphasis added). In support of this ruling, the majority cites **Fisher v. Sexauer**, 53 A.3d 771 (Pa. Super. 2012). However, **Fisher** did not impose upon the plaintiff the burden of establishing **by expert testimony** that the plaintiff had frequent, regular, and proximal exposure to the product in question. Indeed, it echoed the general application of that test, something no party to this litigation disputes. As **Junge** and other

17

cases demonstrate, and as common sense would dictate, product identification and exposure history do not necessarily require the testimony of an expert.

Stripping the question to its essentials, this much is clear: In order to sustain his claim, Nelson had to adduce evidence based upon which a jury could conclude (1) that Nelson used Appellants' products frequently, regularly, and proximally; (2) that those products released asbestos into the air; and (3) that his disease was substantially caused by asbestos. However, given the nature of multiple alleged exposures to numerous asbestos-containing products over decades, neither could his expert reasonably assert, nor could the court reasonably expect him to assert, that product A, to which Nelson frequently was exposed, caused Nelson's mesothelioma to the exclusion of product B, to which Nelson also frequently was exposed. The inference juries long have been allowed to make, the one that **animates** the frequency, regularity, and proximity test, is that a manufacturer of an asbestos-releasing product to which the plaintiff was exposed to the requisite degree caused the plaintiff's mesothelioma, notwithstanding that he also was exposed to other asbestos-containing products.

Nelson plainly satisfied each of these burdens, if not conclusively then sufficiently to warrant submission to a jury. First, he testified extensively to the frequency with which he used each of the asbestos-containing products manufactured by Appellants. He identified them affirmatively, anchored

18

their use in certain time periods, and associated them with certain tasks that he performed. Second, evidence was adduced that these products contained asbestos at the time Nelson attested to using them. Third, Dr. DuPont testified that such asbestos, if inhaled in sufficient amounts, could cause mesothelioma.

*Betz*, *Gregg*, and other such cases are **defined** by the unavailability of the sort of evidence that we have in this case of frequent, regular, and proximal exposure to products that undisputedly contained asbestos. *Cf. Summers v. Certainteed Corp.*, 997 A.2d 1152 (Pa. 2010) (Saylor, J., concurring) ("Notably, in [*Gregg*], this Court recently credited the opinion announcing the judgment of the Superior Court in the present case . . . to the degree that it rejected the 'any breath' theory as establishing a jury issue **in cases in which the plaintiffs' exposure to a defendant's asbestos-containing product is *de minimus* [*sic*].**" (emphasis added)). Notably, in the cases relied upon by the trial court and Nelson, in which any-exposure causation was deemed admissible and/or sufficient to create a *prima facie* case requiring submission to a jury, the exposure at issue was not *de minimis*. *See Smalls v. Pittsburgh Corning Corp.*, 843 A.2d 410 (Pa. Super. 2004); *Cauthorn v. Owens Corning Fiberglas Corp.*, 840 A.2d 1028 (Pa. Super. 2004); *Lonasco v. A-Best Prods. Co.*, 757 A.2d 367 (Pa. Super. 2000). I discern no indication that *Betz* had the effect of abrogating, or was intended to abrogate, these cases' precedential value. Indeed, the *Betz* Court cited but did not purport to diminish the effect of

these decisions. *See* 44 A.3d at 50 n.26; *cf. Gregg* 943 A.2d at 221 (discussing Judge Bowes' citation of *Lonasco* in her dissent from the underlying direct appeal). I find no case law that requires exclusion solely because an expert who testifies to causation in connection with a plaintiff's extensive occupational exposure to asbestos also acknowledges a defining attribute of dose-responsive toxicity: That, independently of **substantial** causation, every fiber contributes to the accretion of harmful fibers that, in sufficient quantities, may cause the affliction(s) in question.

The *Gregg* Court approvingly quoted the trial court's opinion in that case to the following effect:

> [T]here is no requirement that plaintiff must prove how many asbestos fibers one must inhale necessary to a determination of causation; however, evidence of exposure must demonstrate that the plaintiff worked, on a regular basis, in physical proximity with the product and that his contact with same was of such nature as to raise a reasonable inference that he inhaled asbestos fibers that emanated from it.

*Gregg*, 943 A.2d at 220. This quotation makes very little sense if the mere mention of the any-exposure proposition, which is associated with **any** dose-responsive illness, compromises the probative value of all of the testimony of the expert who mentioned it.

In my view, even a modest extension of the *Betz* holding beyond cases involving only *de minimis* exposure threatens to eclipse a considerable proportion of asbestos litigation, given the challenges confronting plaintiffs in establishing substantial causation decades after the allegedly causative

exposure. ***See Gregg***, 943 A.2d at 226 (acknowledging "the difficulties facing plaintiffs in this and similar settings, where they have unquestionably suffered harm on account of a disease having a long latency period and must bear a burden of proving specific causation under prevailing Pennsylvania law which may be insurmountable"). While it is difficult to balance Pennsylvania's well-settled law regarding the establishment of substantial causation with the need to ensure the existence of a meaningful remedy for grave injury, the majority's application of ***Betz*** to this case tips that balance heavily in favor of defendants.

Our legislature has had decades to impose a bright-line rule precluding all testimony that contains any reference to an any-exposure theory of causation, but it has declined to do so. Nor has our Supreme Court imposed such a bright-line rule, despite its opportunity to do so in ***Gregg***, ***Betz***, and other asbestos cases. Each body, in its own sphere, is more qualified than this Court to embark upon change of such sweeping consequence.

Even if I allow that this is a case closer to ***Betz*** than I believe it to be, I encounter a second problem with the majority's ruling. It is beyond cavil that a trial court's decisions regarding the admissibility of evidence, including expert testimony, lie in that court's discretion. We will overturn such decisions only when that discretion is abused. ***See Grady v. Frito-Lay, Inc.***, 839 A.2d 1038, 1046 (Pa. 2003). "An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires . . . manifest unreasonableness, or partiality,

21

prejudice, bias, or ill-will, or such lack of support so as to be clearly erroneous." *Id.* Notably, in both *Gregg* and *Betz*, our Supreme Court affirmed trial court decisions to **exclude** expert testimony; it did not determine that either court abused its discretion, and the Court did not reverse upon that basis.

This case arises in the opposite context. Here, the trial court, following a detailed and careful inquiry into the qualifications and opinions of Dr. DuPont, determined that he should be permitted to testify. Pennsylvania courts long have characterized our standard for the admissibility of expert testimony as "liberal." *See*, *e.g.*, *Flanagan v. Labe*, 666 A.2d 333, 335 (Pa. Super. 1995) ("Pursuant to Pennsylvania's liberal standard, witnesses may testify as experts if they possess knowledge outside the ordinary reach and offer testimony that could assist the trier of fact."). Unlike in *Betz*, where our Supreme Court focused upon Dr. Maddox's selective reliance upon epidemiological evidence, his avoidance of further development of the topic, and his lack of qualifications regarding same in his career as a pathologist, in the instant case Dr. DuPont testified to his extensive experience as a clinical pulmonologist in an industrial area treating patients with asbestos-related ailments, his responsibility as such to remain familiar with the medical literature, his reliance upon peer-reviewed epidemiological materials as well as authoritative texts, and other relevant matters scrupulously avoided by Dr. Maddox in *Betz*. *See* DuPont Depo. at 28-29, 31-33. For all of the foregoing reasons, I dissent from the trial court's substantial expansion of

***Betz*** and its finding that, under its interpretation of that case, the trial court abused its discretion.[5]

Finally, I also disagree with the majority's determination that certain comments made by Appellee's counsel's during closing argument so prejudiced the jury that a new trial was required. "[I]t is well-settled that whether to declare a mistrial is [a] decision within the discretion of the trial court, whose vantage point enables it to evaluate the climate of the courtroom and the effect on the jury of closing arguments." ***Clark v. Phila. Coll. of Osteopathic Med.***, 693 A.2d 202, 206 (Pa. Super. 1997); ***see Narciso v. Mauch Chunk Twp.***, 87 A.2d 233, 234-35 (Pa. 1952) (noting that the determination of whether the trial court abused its discretion in denying a mistrial for an allegedly improper comment in a closing argument "is determined by an examination of the remark made, the circumstances under which it was made and the precautions taken by court and counsel to remove its prejudicial effects").

_____

[5] The majority stops once it determines that the trial court erred in admitting Dr. DuPont's testimony. Because I disagree with that ruling, I also would take up Appellants' related challenge to the sufficiency of Dr. DuPont's testimony to establish substantial causation. Nelson's testimony standing alone established a basis upon which a jury, crediting Nelson's testimony, could conclude that he was frequently, regularly, and proximately exposed to asbestos released from products manufactured by one or more of the Appellants during many years of Nelson's employment. Pennsylvania case law establishes that questions of proximate causation should be submitted to a jury. ***Summers***, 997 A.2d at 1163-64. Finding, as I would, that Dr. DuPont's testimony was admissible, I would hold that the trial court did not abuse its discretion in submitting the case to the jury.

In this case, the issue is the propriety of Appellee's counsel's comments to the general effect that the noneconomic damages in this case should be assessed at a level greater than the $1 million award for economic damages to which the parties stipulated. It certainly is true that attorneys may not propose that a jury award an amount certain in non-economic damages. *See, e.g., Joyce v. Smith*, 112 A. 549, 551 (Pa. 1921); Maj. Op. at 32 (citing cases). However, despite this limitation, counsel retains a great deal of latitude to argue his or her case zealously and dramatically, latitude that courts do not intrude upon lightly. *Millen v. Miller*, 308 A.2d 115, 117 (Pa. Super. 1973).

Appellants and the majority analogize this case to *Joyce*, in which counsel specifically urged a jury to award an amount certain in damages. *See* Maj. Op. at 33. I cannot subscribe to that analogy. To the contrary, as did the trial court, I find this case to be on all fours with our opinion in *Clark*, which the majority labors to distinguish. *See* Maj. Op. at 33-36. There, as here, the attorney in question referred to economic damages— there, symbolically, in the form of a horizontally transected triangle; in this case, by reference to the $1 million in economic damages stipulated by the parties. *Clark*, 693 A.2d at 206. There, as here, the attorney in question suggested that the jury should award noneconomic damages well in excess of economic damages—there, symbolically, by suggesting that noneconomic damages should be akin to the wider portion of the triangle, with economic damages being only "the tip of the iceberg," *id.*; in this case, by counsel's

mathematically hyperbolic comments that he believed non-economic damages were worth "infinitely more" than the stipulated economic damages. *See* Maj. Mem. at 35 (quoting Notes of Testimony ("N.T."), 3/8/2010, at 78).[6]

At the sidebar prompted by Appellants' objections, Appellee's counsel admitted that he was precluded from proposing a specific award of damages as to any category of non-economic damages. *See* N.T., 3/8/2010, at 84-87 (Appellee's counsel: "The law provides that I am not allowed to suggest a monetary amount."). Moreover, counsel for Crane acknowledged that Appellee's counsel "absolutely" could "say to [the jury that] you can start at

---

[6]    In a non-trivial mischaracterization, the majority treats infinity as though it were a number, both implicitly—in its reliance on *Joyce* and similar cases—as well as explicitly. *See* Maj. Op. at 36 ("[C]ounsel for Nelson provided the jury with a formula to calculate damages and an amount to plug into that formula. Here, counsel's express reference to the stipulated economic damages was not evocative, but declarative and algebraic."). However, an injunction to assess damages by "infinity's" measure is no more numerical or "formulaic" than the suggestive use of geometry at issue in *Clark*; infinity is no more a number than a triangle is. *Cf.* David Foster Wallace, *Everything and More: A Compact History of Infinity* § 1 (Atlas Books Reissue ed. 2010) ("Beware of thinking that ∞ is just an incredibly, unbelievably enormous number. . . .     Take some . . . transcomputational number[, *i.e.*, $10^x$], imagine it's a grain of sand, conceive of a whole beach, or desert, or planet, or even galaxy filled with such sand, and not only will the corresponding $10^x$ number be $< \infty$, but its square will be $< \infty$, . . . and so on; and actually it's not even right to compare $10^x$ and ∞ arithmetically in this way because they're not even in the same mathematical area code—even, as it were, the same dimension."); *id.* (quoting Galileo, specific source omitted) ("The fundamental flaw of all so-called proofs of the impossibility of infinite numbers is that they attribute to these numbers all of the properties of finite numbers, whereas the infinite numbers . . . constitute an entirely new type of number . . . .").

a million dollars[, the stipulated economic damages,] **and this other stuff is even more valuable than that**.” ***Id.*** at 86 (emphasis added). As well, counsel for Appellee made quite clear to the jury that calculating a just award of non-economic damages was the jury’s task and no one else’s. ***See id.*** at 78 (“It’s up to you folks. Use your common sense. You have a sense of what these things are worth. . . . I’m not permitted by law to give you a number. I can’t tell you a damage award, that I would be happy with and say I think that’s great, I think that’s fair. . . . It’s up to you folks to do that.”).

The majority conflates counsel’s references to the stipulated economic damages with the complained-of comments:

> Effectively, counsel (1) identified twelve individual elements of non-economic damages; (2) suggested to the jury that it consider a different award for each element but then add the individual amounts onto a single line; and (3) in rather express language, suggested that the jury award Nelson at least $1M for each.

Maj. Op. at 36. However, counsel’s comments read in context do not so enjoin the jury, and certainly not “in rather express language.” It is at least equally reasonable to understand counsel’s comments as conforming to the rule as interpreted in ***Clark***. Counsel’s complained-of argument culminated in his suggestion to the jury that it “start at $1 million, and I believe that each of those elements of damages starting at physical pain are worth infinitely more than that $1 million figure. Now you add a million plus whatever other numbers you assign for these.” Maj. Mem. at 35 (quoting

26

N.T., 3/8/2010, at 80-81). It is not at all clear that counsel directed the jury to start at $1 million as to each of twelve factors; it is at least equally reasonable to interpret the last sentence as counsel returning to that $1 million figure one last time to remind the jury that it had no discretion to assess fewer than $1 million in stipulated economic damages, and encourage them to award "whatever other numbers you assign" for the twelve categories of non-economic damages. **See** N.T., 3/8/2010, at 80 ("I need somebody to remember you must start at $1 million.").

In urging noneconomic damages in excess of the economic damages, counsel did nothing more objectionable than what counsel did in **Clark**, albeit in words rather than a pictorial representation. In **Clark**, we held that the trial court did not abuse its discretion in declining to award a mistrial. Here, as in **Clark**, we are bound to defer to the trial court's assessment—based upon the context of a live and dynamic courtroom rather than our distanced review of a cold record—that this at-most implied attempt to urge the jury to award a specific value for non-economic damages did not fall afoul of the **Joyce** rule. The majority acknowledges that "it discern[s] no error in the[] substance" of the trial court's "instructions on damages." Maj. Op. at 36. Moreover, "[i]t is well-established that juries are presumed to follow the trial court's instructions." **Commonwealth v. Jones**, 811 A.2d

1057, 1063 (Pa. Super. 2002).[7] Even if a majority of this panel might have ruled otherwise in a trial setting, it is not this Court's province to yield to that inclination on appellate review.

After a professional career that involved pervasive and persistent exposure to respirable asbestos from a wide variety of products, Nelson began to suffer from diminished lung function at the age of fifty-three.[8] He was diagnosed a month later with mesothelioma and died approximately one year later. Nelson's final year of life was fraught with suffering: He endured the insertion of a tube to drain fluid from his chest; the extreme pain of a thoracotomy; the severe side effects of three different courses of chemotherapy; gastrointestinal bleeding that could not be treated due to his weakness and ultimately required blood transfusions; and, near the end of his life, a fall that broke his ribs, which were weakened by tumors, the consequences of which prevented Nelson from seeking the radiation treatment that he hoped would prolong his life. In light of Nelson's relative youth at the time of his death, and the degree of his suffering in the last

---

[7] The majority observes that the trial court issued no curative instruction. Naturally, my analysis would not require such an instruction. However, the majority concedes that the trial court's instructions on damages betray "no error in their substance," Maj. Op. at 36, and provides no analysis as to why the failure to issue a curative instruction furnishes a separate basis for relief under the circumstances of this case.

[8] This discussion of Nelson's clinical history is derived from the trial court's opinion. Trial Court Opinion, 6/13/2011, at 8-11.

year of his life, it is not at all surprising that Appellee's counsel implored the jury to award substantial non-economic damages, and the particulars of his manner of doing so in this case did not so patently exceed the bounds of permissible argument as to warrant this Court's interference with the trial court's discretion. Consequently, on this issue, too, I dissent.[9]

Our law speaks clearly of the considerable deference we must afford to trial courts in their evidentiary decisions and their decisions regarding whether and when to grant a mistrial or JNOV. Our law also reflects our faith that a jury, properly charged, can reconcile and measure complex factual circumstances against the applicable law governing causation and damages. Given our absence from the courtroom, where much information that cannot be recorded by a reporter is available to the judge, I believe that it is error to reverse the trial court's exercises of discretion in connection with Dr. DuPont's testimony and Appellee's closing argument. It is precisely to acknowledge close cases that our standard of review calls for deference.

President Judge Emeritus Ford Elliott joins the dissenting opinion.

_____

[9] The majority also acknowledges "Appellants' other complaints regarding counsel's closing arguments in the damages phase," including oblique references to settlement discussions and suggestions of punitive considerations in the assessment of damages. Maj. Op. at 37. While I agree with the majority that such language may be "inflammatory, particularly to the extent that it attributes improper motives to Appellants," *id.*, these brief comments, which only indirectly touched upon problematic matters, would not sway my analysis.

Judge Ott concurs in the result.